**UNITED STATES of America, Plaintiff,**

**v.**

**Israel SANTIAGO–LUGO (01), Defendant.**

**Crim. 95–029 (JAF).**

United States District Court,
D. Puerto Rico.

Sept. 21, 1995.

Order After Hearing Oct. 3, 1995.

Bruce A. Pagel, Special Litigation Counsel, Francisco Rebollo–Casalduc, Guillermo Gil, U.S. Attorney, District of Puerto Rico, San Juan, Puerto Rico, Karen Tandy, Deputy Chief for Litigation, Narcotics and Dangerous Drug Section, U.S. Department of Justice, Washington, DC, for Plaintiff.

Erick Morales, Humberto Ramirez, San Juan, PR, for Defendant.

### MEMORANDUM ORDER

FUSTE, District Judge.

The court has considered the defendant's motion to suppress evidence, *Docket Document Nos. 410 & 485*, and the government's response, *Docket Document No. 440*. The court has also considered the supplemental filings made by the parties after the suppression hearing held on August 29, 1995. *See Docket Document Nos. 555 & 559*. On the basis of the parties' arguments and submissions on a stipulated record, the court expands on our earlier denial of defendant's motion to suppress categories of evidence one and three described below. Judgment is reserved with respect to evidence category two.

### I

During the months of July and August 1993, a civil seizure warrant issued, related to Civil Case No. 93–1955 (JP), ordering the seizure of various of defendant Santiago–Lugo's properties, including two residential structures and their permanent fixtures, furnishings, and content, identified as defendants *in rem. See* contents of Civil No. 93–1955 (JP). *See also* Application for Seizure Warrant and Seizure Warrant, under Miscellaneous No. 93–W002(30) HL.

The two residential properties targeted by this narcotics-related civil forfeiture were identified as follows: (1) One Urban Lot # 72, located at Ibiza Street, Paseo Las Brisas, Río Piedras, Puerto Rico, with all its contents, appurtenances, and improvements thereon, and (2) One Parcel of Land located at Contorno Ward, Toa Alta, Puerto Rico, with all its contents, appurtenances, and improvements thereon. These properties were the primary and secondary residences of Israel Santiago–Lugo, respectively.

The civil seizure warrant was executed by the U.S. Marshals Service on or about August 17, 1993, and the contents were duly inventoried by the U.S. Marshals Service and a U.S. Marshals Service contractor, Caribbean Inventory and Marketing Service, Inc. ("CIMS"). *See* Government's Exhibits 4, 5, 6, and 10, Suppression Hearing.

The inventory documents show that most items qualifying as "content" were physically taken from the properties. Other less portable items, such as electric ranges, refrigerators, and air conditioners, remained on the properties under U.S. Marshals Service control. Israel Santiago–Lugo, who resided primarily at Paseo Las Brisas, executed an agreement with the U.S. Marshals Service to remain at the Paseo Las Brisas property as a tenant, being responsible for the items not removed, pending final disposition of the civil forfeiture proceedings. *See Government's Exhibit 9, Suppression Hearing.*

During the process of executing the civil forfeiture seizure warrant, law enforcement personnel assisting the U.S. Marshals Service, the U.S. Marshals Service, and CIMS, inventoried and removed the content of a home office that Israel Santiago–Lugo kept at the Paseo Las Brisas residence. One day later, on August 18, 1995, a Drug Enforcement Administration ("DEA") agent by the name of Frederick Marshall, applied for a criminal search warrant directed to the contents previously removed from Israel Santiago–Lugo's home office at Paseo Las Brisas, including a computer, documents, ledgers, bank documents, corporate documents, telephone listings, and other papers and documents that, during the required inventory under the civil seizure warrant, appeared to

have potential value in the ongoing investigation of Israel Santiago–Lugo's activities for narcotics trafficking and money laundering, as well as other criminal violations. DEA Agent Frederick Marshall subscribed a detailed affidavit to support probable cause.[1]

The search warrant was issued and executed to allow the DEA an opportunity to carefully inspect the contents previously removed by virtue of the seizure warrant. Since the property had been seized and was legally in the hands of the government, the criminal search warrants were served upon the actual custodians, and the documents were made available to Internal Revenue Service agents.

The stipulated record and the statements made by counsel for the defendant at the suppression hearing confirm that Israel Santiago–Lugo has not attacked the validity of the civil seizure, and case No. 93–1955 (JP) stands ready for disposition on the merits.

In 1995, subsequent investigations resulted in the present indictment against Israel Santiago–Lugo for narcotics, continuing criminal enterprise, drug conspiracy, money laundering, and a host of other related charges. The defendant's motion to suppress claims that for purposes of the present indictment, the uncontested civil seizure, the resulting inventory and removal of content, and the subsequently issued search warrant, constitute an illegal search and seizure in contravention to the Fourth Amendment to the United States Constitution. The defendant's motion to suppress is directed to three distinct categories of items.

*First Category:*

(1) Papers taken from the Santiago–Lugo Paseo Las Brisas residence;

(2) photographs of two firearms found at the Paseo Las Brisas residence;

(3) photographs of the interior of the Paseo Las Brisas residence, taken while the seizure warrant was being executed;

(4) evidence with respect to the ownership of various properties.

This first category was part of the content removed from the Paseo Las Brisas residence after being inventoried by the U.S. Marshals Service and CIMS. The items were not, at the time of seizure, examined in greater detail and were further searched and examined only after the execution of the search warrant subsequently obtained based on the affidavit of DEA Agent Frederick Marshall.

*Second Category:*

The second category of items which the defendant seeks to suppress consists of two letters containing incriminatory information regarding Santiago–Lugo, his brother (who was subsequently murdered), and others of his co-conspirators. As we discuss below, these letters were initialed by Special Agent Alfredo Bellamy before they were inventoried and removed from the premises with the rest of the items taken for safekeeping.[2]

*Third Category:*

The third category consists of two firearms seized either at the Paseo Las Brisas residence or in a vehicle also seized on the premises.

In addition to stipulating that the above recital of facts is the sequence of events that leads to the motion to suppress, the parties also stipulated that the criminal search warrant was never formally returned as required by Fed.R.Crim.P. 41(d).

## II.

Defendant alleges that law enforcement officers could not, despite having procured a

---

1. The court refers the reader to the affidavit. *See Government's Exhibit 7, Suppression Hearing.* There is no need for the court to address the issue of probable cause under this affidavit. The adequacy of probable cause has not been challenged. Furthermore, probable cause is not relevant under the applicable law regarding inventory searches or the plain view exception to the warrant preference rule.

2. After the suppression hearing and the resulting stipulations, the government filed, on September 11, 1995, an informative motion mentioning Special Agent Bellamy's intervention with the letters. *See Docket Document No. 596.* At the hearing, the court did not hear of Bellamy. The government only mentioned that the letters were a separate category on account of agents having seen the letters as readily incriminatory information.

civil seizure warrant covering the residence, its content, and all permanent furnishings and fixtures, legally conduct an inventory search of the movable contents of the residences without a separate criminal search warrant naming the items to be searched with the requisite particularity and a particularized showing of probable cause. Such a claim misconceives the nature of a civil seizure and the resulting inventory process and misunderstands the existing jurisprudence governing the availability of an inventory search attendant to a seizure of residential property.

Undoubtedly, there exists a growing and relatively uniform body of law that prohibits the government from conducting a warrantless inventory search of the contents of a residence attendant to a seizure of the residential property. *United States v. Ladson*, 774 F.2d 436 (11th Cir.1985); *United States v. Parr*, 716 F.2d 796 (11th Cir.1983); *United States v. Showalter*, 858 F.2d 149 (3rd Cir. 1988); *United States v. Adams*, 845 F.Supp. 1531 (M.D.Fla.1994). In *Ladson*, like its progeny, the government attempted to justify an inventory search of a residence attendant to a civil seizure of the residential property without first having sought and attained court authorization to enter the premises and conduct the inventory. Because the seizure warrant did not order the seizure of the contents of the home nor authorize entry, the court concluded that the government exceeded the scope of the issued warrant. *Ladson*, 774 F.2d at 440. The court, following *Parr*, refused to extend the inventory exception to the warrant preference rule to the inventory of a residence. *Id.* With this rule of law, we have no quarrel.

■ However, the case now before the court differs from *Ladson* and its progeny in two significant aspects. First, the warrant procured by the government in this case expressly authorized the seizure of content and permanent fixtures and furnishings, many of which would certainly have been within the residence. Entry into the residence was, therefore, a natural and neces-

sary consequence of executing the warrant. *Ladson*, itself, acknowledges that entry would be justified on these grounds. *Id.*

■ Second, and most importantly, the warrant expressly authorizes an inventory of the contents of the residence, which inventory is narrowly circumscribed and complies with the United States Marshals Service formalized policies and procedures for the seizure of assets. *See Government's Exhibit 1, Suppression Hearing, p. 9. See also* United States Marshals Service, Policy and Procedures Manual, Vol. XXI, Seized Assets, pp. 21–69 (1994). Unauthorized inventory searches leave the court exposed to the danger of *post hoc* justification, the government having created no reliable record of the basis upon which the inventory was to be conducted. *See South Dakota v. Opperman*, 428 U.S. 364, 383, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). But, where the court has granted prior authorization to enter and inventory, the dangers of abuse are attenuated by the procedural strictures imposed, and, where the basis for the entry or inventory is challenged, there exists a reliable record to which the court may turn. Where these safeguards are in place, the courts have permitted the inventory of a seized residence. *United States v. One Parcel of Real Property*, 724 F.Supp. 668 (W.D.Mo.1989); *United States v. United States Currency in the Amount of $324,225.00*, 726 F.Supp. 259 (W.D.Mo.1989).

Since the inventory search conducted in this case occurred pursuant to prior court authorization contained in the seizure warrant, and since defendant has not otherwise challenged or adduced evidence to challenge the basis upon which the inventory was conducted, we detect no misconduct tainting the evidence procured under the subsequently issued criminal search warrant.[3] Accordingly, the motion to suppress for failure to secure a criminal search warrant prior to the seizure and inventory of the defendant's residences is denied as to all three categories of evidence of which defendant has sought suppression.

---

**3.** Defendant has made no claim, either of law or fact, that the treatment afforded the second category items for which suppression is sought invalidated the inventory search as a whole. We address the treatment afforded these letters and its impact upon their admissibility, below.

### III.

Defendant further posits that the personal letters comprising the second category of items for which suppression is sought must be suppressed because Special Agent Alfredo Bellamy exceeded the bounds of the permissible inventory search. The court assumes that the defendant means that Special Agent Bellamy exceeded the boundaries of the inventory search when he initialed two letters found in defendant's home office before placing them with the other items for inventory and safekeeping. One possible implication of the facts adduced is that Special Agent Bellamy had marked the two letters with his initials because he had examined the letters and concluded that they were or might be of some evidentiary value. Defendant claims that any such examination of documents exceeds the scope of the inventory search. The government responds that the letters fall within the "plain view" exception to the warrant preference rule.

*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), explains that the "plain view" exception to the warrant preference rule is available only where (1) the seizing agent was lawfully in a position to view the evidence, (2) the agent inadvertently discovered the evidence, and (3) the incriminating nature of the disputed evidence is apparent on its face. *Id.* at 464–73, 91 S.Ct. at 2037–42. Relying, as it does, on the plain view exception to the warrant preference rule, the government bears the burden of showing that the exception applies to the facts of this case. *Id.* at 455, 91 S.Ct. at 2032.

Accordingly, we **ORDER** the government to provide an affidavit of Special Agent Bellamy, outlining the circumstances of the discovery of the letters, the initialing, the eventual safekeeping, and further intervention. The affidavit will be filed with the Clerk of the Court **within the next three (3) days.** We reserve judgment on the suppression of the initialed letters until such time as the court has had an opportunity to review the affidavit presented and/or hear the testimony of Special Agent Bellamy. As the trial has now begun, the government is ordered to refrain from making reference to the initialed letters or their content in the presence of the jury until the court has ruled dispositively on this issue.

**IT IS SO ORDERED.**

### *ORDER AFTER HEARING*

In our Memorandum Order of September 21, 1995, *Docket Document No. 665,* we ordered Special Agent Alfredo Bellamy, of the Internal Revenue Service, to appear and testify on September 29, 1995, regarding his handling of two letters discovered while conducting an inventory of the contents of a seized residence belonging to Israel Santiago–Lugo. The letters contained information regarding codefendant Israel Santiago–Lugo, his brother Raúl Santiago–Lugo (subsequently murdered), and others of his alleged co-conspirators. The letters were initialed by Special Agent Bellamy before they were boxed and removed from the premises of Israel Santiago–Lugo's home at the time of the execution of a civil seizure warrant that included the property and the content. The letters were turned over to the Internal Revenue Service after the execution of a criminal search warrant subsequently obtained, based on the affidavit of Drug Enforcement Administration Special Agent Frederick Marshall.

Defendant Israel Santiago–Lugo seems to argue that the personal letters must be suppressed because Special Agent Bellamy exceeded the bounds of the civil seizure warrant and the resulting inventory and removal of content when the agent perused and initialed the letters found in the defendant's home office before packaging them with other items for safekeeping. The defendant simply argues that the letters must be suppressed and fails to articulate specific reasons other than the need for a criminal search warrant as a condition precedent. Since the government argues that the letters are admissible because they were in plain view, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the court decided to hear Special Agent Bellamy in order to determine whether the letters were found in a manner warranting the application of the plain-view exception. Originally, codefendant Santiago–Lugo did not express interest in Special Agent Bellamy's

testimony, but at the September 29, 1995, hearing, his attorneys cross-examined the agent and presented the testimony of codefendant Santiago–Lugo's common-law wife. In the course of Special Agent Bellamy's testimony, the court also became aware that agent Bellamy has searched and seized Santiago–Lugo's wallet-phone directory, allegedly after having procured uncoerced consent to do so.

# I.

## The Letters

The execution of the civil seizure warrant brought to the home of Israel Santiago–Lugo, at Paseo Las Brisas, Río Piedras, Puerto Rico, a number of Deputy U.S. Marshals, U.S. Marshals Service contract personnel, and law-enforcement agents, including Special Agent Bellamy, of the Internal Revenue Service. Special Agent Bellamy's function was to keep the seized content in order and pack it to be taken away in the manner found. While the content of Israel Santiago–Lugo's home office was being packed by the U.S. Marshals and their contract moving and storage personnel, Special Agent Bellamy was shown the content before placing it in boxes. United States Marshals Service contract personnel found the letters. Special Agent Bellamy perused and initialed the letters and they were placed in boxes by the contract personnel as part of the home office content ordered seized. A few days later, after the criminal search warrant was executed over the documents found in the home office, Internal Revenue Service agents verified that the letters were of evidentiary value.

■ Special Agent Bellamy, the U.S. Marshals, and other law-enforcement personnel were legally inside the home of Israel Santiago–Lugo, executing a valid civil seizure warrant over all of defendant's known properties. Although no criminal search warrant had issued at that point in time, the circumstances were such that Special Agent Bella-

my could seize evidence in plain view without need of a criminal search warrant. The initial intrusion that brought Special Agent Bellamy within plain view of the letters was not supported by a criminal search warrant, but by the civil seizure warrant which at that point in time legitimized packing the letters in plain view. The letters were found inadvertently in the process of arranging the content for packaging, and they came into view during the process of conducting the valid civil seizure of the content of the home and of the home office.

Special Agent Bellamy never exceeded the limits of the civil seizure warrant. He took no independent steps to search for criminal evidence against Israel Santiago–Lugo while he monitored the packing of the content of the home office to make sure that its contents were packed in the order found. As Special Agent Bellamy explained, "content" included every item, every paper found.[1]

As stated before, the prior justification for the intrusion was the execution of the civil seizure warrant. Special Agent Bellamy never extended the civil seizure to an unauthorized general search of the home. He did not search to find something incriminating, and the fact that he examined and initialed the letters cannot serve as the basis for alleging that he overextended the scope of the civil seizure warrant. The civil seizures that took place that day at various locations and different properties required the presence of trained agents who would later account for the execution of the civil seizure against property and content. In order to inventory properly, agents had to look at the items and peruse them following a logical sequence. Since the letters were in plain view, there was no logical need for a judicial officer to validate what he had legally found. *Coolidge* makes it clear that the rationale for the plain-view exception accounts for, in substituted form, the requirements of a magistrate's scrutiny and limits on the search typical of a criminal search warrant validly obtained. *See Coolidge*, 403 U.S. at 467–68, 91 S.Ct. at 2038–39. In the present case, the

---

**1.** We understand that in the course of an inventory such as that conducted here, though all items are to be kept, and such items are generally to be kept in the order found, items of intrinsic value, trash, and the remainder of the items will be separated as may be necessary to organize and protect the items seized.

plain-view doctrine validates Special Agent Bellamy's examination and initialing of the letters. While it is true that he initialed only selected documents that appeared to be more important, his initial intrusion at the residence was validated by the civil seizure warrant authorized by a judicial officer. Since the letters, which were not known to have existed at the time the civil seizure warrant issued, were within the limited radius of action sanctioned by the civil seizure warrant, their discovery in plain view was both inadvertent and inevitable. Sooner or later the letters would surface, either in the manner found or later during the execution of the subsequently-obtained criminal search warrant. *See, c.f., Nix v. Williams,* 467 U.S. 431 (1984).

Lastly, the court stresses that Special Agent Bellamy's testimony left the court convinced that the discovery of the letters was not anticipated. Special Agent Bellamy did not know in advance the nature or location of this evidence so as to require a criminal search warrant. Consequently, the finding of the letters in plain view makes them admissible without Fourth Amendment concerns if found otherwise pertinent and relevant in the context of the trial evidence being received at this time.

## II.

### *The Wallet Phone Directory*

■ Special Agent Alfredo Bellamy, while in the presence of Israel Santiago–Lugo in the kitchen area of the seized residence, observed a man's wallet belonging to Israel Santiago–Lugo on the kitchen counter. Special Agent Bellamy, having developed an interest in the wallet, secured Israel Santiago–Lugo's consent to examine the wallet. There he found Santiago–Lugo's wallet-size phone directory. Special Agent Bellamy asked Santiago–Lugo for permission to keep the directory. Santiago–Lugo again consented, and Special Agent Bellamy kept the directory. The same was never inventoried as part of the civil seizure. He delivered it directly to the Internal Revenue Service.

There being consent, the phone directory was validly retained by Special Agent Bella-

my. The consent given by Israel Santiago–Lugo was clear, unequivocal, and wholly uncoerced. He was not in custody and the civil seizure had not brought about any need for the U.S. Marshals Service or other law-enforcement personnel to make a show of force with guns or other intimidating procedures.

Regarding the phone directory, the court gives little credit to the testimony of the defendant's common-law wife. She only claims that the wallet was found in the kitchen or that it was impossible for the defendant to have consented to the search and seizure of the wallet. She could not, however, state that she witnessed all conversations by Special Agent Bellamy with the defendant or any other person in the kitchen area. According to her testimony, the defendant always left his wallet in the pocket of his pants, on top of a dresser, while he slept. She claims that on the morning of the execution of the civil seizure, the pants and the wallet remained in the bedroom, and she suspects that the phone directory was taken from the wallet by agents who searched the room; however, she did not see any agent searching the room or looking for the pants or the wallet. In addition, her demeanor left doubt about her truthfulness. While she initially tried to establish that she was next to the defendant at all times and, therefore, witnessed all his conversations, she later had to admit that, as the inventory progressed, she was asked to participate in the inventory process at various locations within the house and was not next to the defendant at all times. Furthermore, we find wholly unbelievable her assertion that, before going to bed the night before, she could see the wallet bulge in the pants on the dresser. Special Agent Bellamy's testimony, on the other hand, was credible and consistent.

Consent is always more of a factual issue than a legal question and, upon the totality of the circumstances, the court finds that the defendant voluntarily surrendered his phone directory. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

## III.

Defendant Santiago–Lugo's motion to suppress is **DENIED** with respect to the items

included in Category II of items for which suppression was sought, including the letters initialed by Special Agent Bellamy and the telephone directory seized.

**IT IS SO ORDERED.**